# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **SHEILA F. STANLEY,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:04cv00018 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| | ) | |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Sheila F. Stanley, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

-1-

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.""" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Stanley filed a prior application for SSI benefits on May 15, 1981, which was denied initially on May 19, 1981, and which she pursued no further. (Record, ("R."), at 359.) She then filed another SSI application on October 25, 1993, which was denied initially on October 26, 1993, and which she also pursued no further. (R. at 359.) On August 22, 1996, Stanley filed yet another application for SSI benefits, which was denied initially and on reconsideration on October 28, 1996, but which she pursued no further. (R. at 94-97, 359.) Thereafter, Stanley filed yet another SSI application on February 28, 1997, which was denied initially on March 19, 1997, and which she pursued no further. (R. at 98-101, 359.)

Stanley protectively filed the current application for SSI on July 2, 1997, alleging disability as of August 20, 1996, based on myalgia, chronic fatigue, carpal tunnel syndrome, gastroenteritis, severe depression, lupus, ulcers, spastic colon, facial ticks, memory loss, severe headaches, insomnia and hearing voices. (R. at 102-06, 107.) Stanley's claim was denied initially and on reconsideration. (R. at 65-66, 72, 74-75.) Stanley then requested a hearing before an administrative law judge, ("ALJ"), which

was held on June 8, 1999, and at which Stanley was represented by counsel. (R. at 33-55.) By decision dated July 15, 1999, the ALJ denied Stanley's claim. (R. at 14-27.) After the ALJ issued his opinion, Stanley pursued her administrative appeals, (R. at 10), but the Appeals Council denied her request for review. (R. at 4-5.) Stanley then filed an action with this court seeking judicial review of the Commissioner's final decision. By order dated February 14, 2002, this court remanded the case to the Commissioner for further consideration of Stanley's mental impairments, if any, and their impact on his work-related abilities. (R. at 373-74.) A supplemental hearing was held on December 12, 2002, at which Stanley was again represented by counsel. (R. at 417-38.)

By decision dated February 11, 2003, the ALJ again denied Stanley's claim. (R. at 358-64.) The ALJ found that Stanley had not engaged in substantial gainful activity since March 19, 1997.[1] (R. at 364.) The ALJ also found that the medical evidence established that Stanley had a severe impairment, namely severe musculoskeletal impairments, but he found that Stanley did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 364.) The ALJ found that Stanley's allegations of disabling pain and other disabling symptoms were not credible or consistent with the objective evidence. (R. at 364.) The ALJ found that Stanley had the residual functional capacity

---

[1]Although the ALJ stated in the body of his decision that Stanley performed substantial gainful activity from November 2000 through June 2002, when she worked as a caregiver, he, nonetheless, gave her the benefit of the doubt by formally finding that she had not performed substantial gainful activity since March 19, 1997, the date on which Stanley's last SSI claim prior to the current claim was denied and pursued no further. Thus, as the ALJ stated, res judicata applies to the period on and before March 19, 1997. (R. at 359.)

Case 2:04-cv-00018-GMW-PMS   Document 17   Filed 03/30/05   Page 3 of 28   Pageid#: 61

to perform light work,[2] diminished by an inability to engage in repetitive work above shoulder level. (R. at 364.) Thus, the ALJ concluded that Stanley could perform her past relevant work as a sewing machine operator. (R. at 364.) Therefore, the ALJ concluded that Stanley was not under a disability as defined by the Act and was not eligible for SSI benefits. (R. at 364.) *See* 20 C.F.R. § 416.920(f) (2004).

After the ALJ issued his opinion, Stanley pursued her administrative appeals, (R. at 352-54), but the Appeals Council denied her request for review. (R. at 319-22.) Stanley then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2004). The case is before this court on the Commissioner's motion for summary judgment filed August 11, 2004, and Stanley's motion for summary judgment filed July 12, 2004.

## II. Facts

Stanley was born in 1952, (R. at 102), which, at the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. § 416.963(d) (2004). She has a tenth-grade education,[3] including some special education classes, and past relevant work experience as a sewing machine operator in a garment

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting and carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2004).

[3]There is some conflict in the record regarding Stanley's education. Her disability report indicates that she completed the tenth grade, she testified at her initial hearing that she had a ninth-grade education, but at her supplemental hearing that she had a tenth-grade education. (R. at 37, 421.)

factory.  (R. at 168.)

At her December 12, 2002, supplemental hearing, Stanley testified that she had failed the general equivalency development, ("GED"), test three times.  (R. at 421.) She testified that her hands and feet stayed cold, she experienced arm pain and was very depressed.  (R. at 421.)  Stanley testified that she had attempted to work as a caregiver in the home health industry from November 2000 through June 2002, earning $6.40 per hour, but had to quit due to pain and mental stress.  (R. at 421-24.)  She stated that she had difficulty coping with stress, noting that she felt like she was having a nervous breakdown at times.  (R. at 422.)  Stanley testified that she was taking three Effexors per day, which were not helping her condition.  (R. at 422.)  She reported that she had been on antidepressants for 20 years, including Prozac and Paxil, neither of which had helped her condition.   (R. at 425-26.) She denied any malingering behavior.  (R. at 422.)

Stanley testified that she received mental health counseling "[y]ears ago," which did not help.  (R. at 427.)  She stated that she piddled around the house and did not perform housework like she previously did.  (R. at 428.)  Stanley testified that her husband and son performed the housecleaning and yardwork.  (R. at 428.)  She testified that she had a driver's license, but had not driven in six months due to depression.  (R. at 428.)   She stated that although she used to enjoy sewing and working crossword puzzles, these activities no longer interested her.  (R. at 428.)

Dr. Edward Griffin, M.D., a medical expert, also was present and testified at Stanley's hearing.   (R. at 429-33.)   Dr. Griffin testified that the only diagnosis

-5-

adequately documented in the record was cervical disc disease.  (R. at 431.)  He noted
a secondary diagnosis of hypothyroidism, further noting that Stanley had significant
problems with medication compliance.  (R. at 431.)  Dr. Griffin testified that although
a diagnosis of peripheral neuropathy was contained in the record, it lacked explanation.
(R. at 431.)  He further testified that although there was mention of a mood disorder
in the record, Stanley's going on and off of thyroid medication could have a significant
effect on her mood, as could her noncompliance with  antidepressants and her long-
term hydrocodone use.  (R. at 431-32.)  Dr. Griffin further noted that because
psychologist Hughson's assessment indicated malingering, it could not be used to
assess Stanley's mental impairment.  (R. at 432.)  Dr. Griffin concluded that Stanley
did not meet or equal a listed impairment, noting that she would be limited to lifting and
carrying items weighing up to 30 pounds occasionally and up to 15 pounds frequently.
(R. at 432.)  He further opined that Stanley should not engage in repetitive work above
shoulder level.  (R. at 432.)  Dr. Griffin testified that Stanley's testimony that she had
to get up at night due to pain and that she had to lie down during the day due to pain
would not change his diagnoses.  (R. at 432.)

Cathy Sanders, a vocational expert, also was present and testified at Stanley's
supplemental hearing.  (R. at 433-36.)  She classified Stanley's past work as a sewing
machine operator as light and unskilled and as a caregiver as heavy[4] and unskilled.  (R.
at 435.)  Sanders was asked to assume an individual of Stanley's age, education and
work history, who was limited as set forth in Dr. Griffin's testimony.  (R. at 435-36.)
Sanders testified that such an individual could perform a significant number of jobs

---

[4]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting and
carrying of items weighing up to 50 pounds.  If someone can perform heavy work, she also can
perform medium, light and sedentary work.  *See* 20 C.F.R. § 416.967(d) (2004).

existing in the national economy, including jobs as a salad preparation worker, a parking lot attendant, a maid, a ticket clerk, a kitchen and counter worker, a hand packager, a sewing machine operator and a sorter and assembler. (R. at 436.) Sanders was next asked to consider the same individual, but who was limited as set forth in Stanley's testimony. (R. at 436.) Sanders testified that such an individual could perform no jobs. (R. at 436.)

In rendering his decision, the ALJ reviewed records from Dr. Gregory Corradino, M.D.; Sharon J. Hughson, Ph.D., a licensed clinical psychologist; Dr. Karl W. Konrad, M.D., Ph.D.; Dr. Richard Norton, M.D.; Physician Access; Dr. Atique Mirza, M.D.; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Randall M. Hays, M.D., a state agency physician; Donna Abbott, M.A., a licensed psychological examiner; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. Gayle Roulier, M.D.; Dr. Todd Cassel, M.D.; and Clinch River Health Services.

The record indicates that Stanley saw Dr. Richard Norton, M.D., at Physician Access from April 22, 1996, through July 8, 1998. (R. at 191-290.) From April 1996 through November 1997, Stanley complained of "nerves," including hearing voices, cold hands, dropping objects, insomnia, spastic colon, an ulcer, fibromyalgia, short-term memory loss, headaches, facial twitches, rapid heart rate, shortness of breath, chest pain, breast pain, pain in the hands and feet, numbness of the left toe, joint swelling, lack of energy, dysuria, weakness and sharp sternal pain. (R. at 198, 200, 202, 204, 206, 208-11, 213, 221.) Over this time, she was diagnosed with

-7-

fibromyalgia,[5] systemic lupus erythematous, ("SLE"),[6] depression, gastrointestinal esopahgeal reflux disease, ("GERD"), hypothyroidism, mild schizophrenia/schizoaffective disorder, insomnia, arrhythmia, carpal tunnel syndrome, intervertebral disc disease, anxiety, gastroenteritis, bipolar disorder by history and a breast mass, probably fibrocystic.  (R. at 198, 200-02, 204, 207-08, 211, 213-14, 220-21.)  She was treated conservatively with medications, including Zoloft, Trazadone, Synthroid, Vitamin B complex, Serzone, a Maxair Autoinhaler, Zithromax and Dilex Elixir.  (R. at 200-01, 207-08, 211, 214, 220.)  In December 1996 and again in November 1997, Stanley reported medication noncompliance due to lack of finances. (R. at 198, 211.)

In September 1996, an MRI of Stanley's brain was unremarkable, but an MRI of the cervical spine showed mild narrowing of the cervical exit foramina at the C4-5 and C5-6 levels on the right side.  (R. at 280.)  In December 1996, a physical examination revealed a regular heart, lungs clear to auscultation, no edema of the chest,

---

[5]Fibromyalgia is a chronic condition causing pain, stiffness and tenderness of the muscles, tendons and joints.  It also is characterized by restless sleep, awakening feeling tired, fatigue, anxiety, depression and disturbances in bowel function.  See www.medicinenet.com/fibromyalgia/article/htm.

[6]SLE is a chronic, remitting, relapsing, inflammatory and often febrile multisystemic disorder of connective tissue, acute or insidious in onset, characterized principally by involvement of the skin, joints, kidneys and serosal membranes.  It is of unknown etiology, but is thought to represent a failure of the regulatory mechanisms of the autoimmune system that sustain self-tolerance and prevent the body from attacking its own cells, cell constituents and proteins suggested by the high level of a wide variety of autoantibodies against nuclear and cytoplasmic cellular components seen in affected individuals.  The disorder is marked by a wide variety of abnormalities, including arthritis and arthralgias, nephritis, central nervous system manifestations, pleurisy, pericarditis, leukopenia or thrombocytopenia, hemolytic anemia, elevated erythroycyte sedimentation rate and positive LE-cell preparations.  See DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 958 (27th ed. 1988).

-8-

no jugular venous distention, ("JVD"), a positive Tinel's sign[7] and positive actual compression at the C5-6 level of the spine. (R. at 211.) Chest x-rays revealed no active disease. (R. at 239, 277.) In January 1997, a 24-hour holter monitor yielded negative results and an echocardiogram, ("EKG"), was unremarkable. (R. at 210, 237.) That same month, a physical examination revealed some mild fibrocystic disease of the breast. (R. at 209.) Although Stanley asked Dr. Norton to complete a form stating that she was unable to work, he, instead, stated that she could work occasionally. (R. at 208.) Following this incident, Stanley began seeing Patti Van Hook, a physician's assistant to Dr. Norton. (R. at 207.)

Stanley was reevaluated for her lupus in October 1997, at which time she stated that she was doing some better. (R. at 201.) Stanley was alert, oriented and in no acute distress. (R. at 201.) Later that month, after complaints of shortness of breath, chest x-rays showed only mild interstitial fibrosis with no acute pulmonary changes. (R. at 232.) By the following month, Stanley reported that the inhaler had been "very helpful." (R. at 198.) Physical examination revealed positive epigastric tenderness to palpation. (R. at 198.)

On November 11, 1997, Stanley saw Sharon J. Hughson, Ph.D., a licensed clinical psychologist, for a psychological evaluation at the referral of Disability Determination Services. (R. at 295-99.) Hughson noted that Stanley had difficulty being cooperative throughout the interview, struggling with defensiveness, anger and

---

[7]Tinel's sign is a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve. *See* Dorland's at 1526.

-9-

frustration. (R. at 295.) Stanley reported that she suffered from bipolar disorder, thyroid problems, lupus and fibromyalgia. (R. at 295.) She further reported not being able to "think straight" at times, and she stated that she suffered from rages of anger approximately 3 to 4 times per week lasting for approximately 15 minutes. (R. at 295.) She denied ever taking Lithium. (R. at 295.) Stanley stated that her thyroid problems were controlled by medication. (R. at 295.) She further reported suffering from irritable bowel syndrome, insomnia and short-term memory loss. (R. at 296.) Stanley stated that she was not then in therapy and was not suicidal. (R. at 296.) Although noting one previous suicide attempt, she stated that she had never been hospitalized for psychiatric problems. (R. at 296.)

Stanley reported watching television, managing her own money, shopping, cooking, using the telephone and receiving visits from others. (R. at 297.) She denied performing household chores, but stated that she needed no assistance with self-care. (R. at 297.) Stanley stated that she had no friends and wanted none. (R. at 297.)

Stanley reported having experienced mood swings all of her life and becoming angry over very small things. (R. at 297.) She denied being suicidal or homicidal. (R. at 297.) She reported hearing voices calling her name when she became very sick. (R. at 297.) Hughson noted that Stanley was fully oriented and alert throughout the evaluation. (R. at 297.) She further noted that testing revealed malingering. (R. at 297.) Hughson administered the Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), test, on which Stanley obtained a verbal IQ score of 83, a performance IQ score of 83 and a full-scale IQ score of 83, placing Stanley in the borderline to low average range of intelligence. (R. at 298.) Stanley was diagnosed with bipolar

-10-

disorder, most recent episode mixed, and borderline to low average intellectual functioning. (R. at 298.)

On November 19, 1997, Stanley saw Dr. Karl W. Konrad, Ph.D., M.D., for an evaluation. (R. at 291-93.) A physical examination revealed a full range of motion of all joints and no tenderness, heat, swelling or deformity of any joint. (R. at 291.) Her neck was supple with a full range of motion. (R. at 291.) There was no kyphosis, scoliosis, tenderness or muscle spasm of the back, and she exhibited a full range of motion with negative straight leg raising. (R. at 291-92.) Stanley was able to rise from her chair and get onto and off of the exam table without difficulty, and she was able to move from sitting to lying and back again with no or minimal difficulty. (R. at 292.) Stanley exhibited a full grip into the palm, no tremors or involuntary movements and she walked unassisted without a limp and was able to tandem walk. (R. at 292.) Stanley had 5/5 strength in the upper extremities and grip, and no asymmetrical muscle wasting was noted. (R. at 292.) She was able to bear weight on each leg separately, and she was able to walk on her toes and heels. (R. at 292.) Knee jerks were -1 and symmetrical and all other reflexes were -2 and symmetrical. (R. at 292.) Stanley's sensation was intact throughout to pin prick, vibration and light touch. (R. at 292.) There was no sensory radiculopathy or peripheral neuropathy. (R. at 292.) Stanley had a regular heart rhythm with no murmurs. (R. at 292.) Her pulses were 2+ and there were no signs of arterial insufficiency. (R. at 292.) Stanley exhibited no dyspnea with mild effort or supine position. (R. at 292.) Her breath sounds were clear and symmetrical without rales, rhonchi or wheezes. (R. at 292.) No cyanosis or clubbing was noted. (R. at 292.) Stanley had no tenderness of the abdomen, no guarding and no masses, hernias or ascites. (R. at 292.) Dr. Konrad reported that Stanley was alert

-11-

and oriented with intelligible speech, no aphasias and normal thoughts and ideas. (R. at 292.) He noted that her behavior was appropriate for the situation and that her memory for events surrounding the exam and for personal history was normal. (R. at 292.) Dr. Konrad opined that Stanley was of average intelligence and that she could handle her own funds. (R. at 292.) Dr. Konrad concluded that the physical examination was unremarkable and that Stanley had no impairment-related physical limitations. (R. at 293.)

On November 24, 1997, a mammogram revealed a small focal nodule in the right breast. (R. at 231.) The following month, Stanley complained to Van Hook of head and foot pain, and she reported concern that she had suffered a stroke. (R. at 197.) She was diagnosed with possible Bell's palsy and sinusitis. (R. at 197.) However, a sinus series revealed normal sinuses. (R. at 230.) Stanley was given a Prednisone dose pack and Prozac samples. (R. at 197.)

On December 9, 1997, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment. (R. at 300-03.) Leizer concluded that Stanley was moderately limited in her ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 300-01.) In all other categories of mental functioning, Leizer concluded that Stanley was either not significantly limited or there was no evidence of limitation. (R. at 300-01.) Leizer concluded that Stanley could perform substantial gainful activity. (R. at 302.) This assessment was affirmed by R.J. Milan

-12-

Jr., Ph.D., another state agency psychologist, on August 13, 1998.  (R. at 302.)

Leizer also completed a Psychiatric Review Technique form, ("PRTF"), finding that Stanley suffered from an affective disorder, namely bipolar disorder.  (R. at 304-12.)  Leizer opined that Stanley was only slightly restricted in her activities of daily living, experienced moderate difficulties in maintaining social functioning, often experienced deficiencies in concentration, persistence or pace, but never experienced episodes of deterioration or decompensation in work or work-like settings.  (R. at 311.)

The same day, Dr. Randall M. Hays, M.D., a state agency physician, completed a Report Of Contact, stating that Stanley had no impairment-related physical limitations.  (R. at 314.)

Stanley continued to see Van Hook from January 1998 through June 1998.  (R. at 193-96.)  During this time, she complained of pressure in her head, anxiety, muscle spasms in her neck causing her head to shake, her left leg moving to the left when walking, incontinence at night due to increased body pain, an inability to move her finger due to arthritis, a "knot" in her right arm and both upper and lower extremity redness.  (R. at 193-96.)  Stanley was advised to continue Prozac and was prescribed Protid, Flexeril, Lortab, Prednisone and Suprax.  (R. at 193-96.)  She was diagnosed with persistent sinusitis, anxiety, SLE, a viral syndrome, cervical spasm, questionable seizure activity, arthritis, basilar headaches, hypothyroidism and a right wrist sprain/strain.  (R. at 193-96.)   In June 1998, Stanley again reported medication noncompliance.  (R. at 193.)

-13-

On June 24, 1998, a Medical Report For General Relief And Aid To Dependent Children was completed by Dr. Atique Mirza, M.D., showing a diagnosis of SLE, hypothyroidism and fibromyalgia that would deteriorate with aging, and which would render Stanley unable to work or severely limit her capacity for self-support for 30 days. (R. at 313.) However, Dr. Mirza noted that the extent of Stanley's limitation would be dependent on her symptom control. (R. at 313.) Dr. Mirza concluded that Stanley would need to work in a nonstressful environment. (R. at 313.)

On July 8, 1998, Stanley reported continued headaches in the right occipital area with associated nausea and neck pain, as well as loss of sensation in the right upper extremity. (R. at 192.) Van Hook noted that Stanley was in moderate distress. (R. at 192.) A physical examination revealed tenderness to palpation of the cervical spine and a limited range of motion on right lateral lean, rotation, flexion and extension of the head. (R. at 192.) Bilateral grips were equal and deep tendon reflexes were within normal limits and without paresthesia. (R. at 192.) Stanley was diagnosed with cervical disc disease and lupus. (R. at 192.) She was given Skelaxin samples and Bupap. (R. at 192.) On July 16, 1998, x-rays of the cervical spine revealed no gross abnormalities. (R. at 225.) An MRI of the cervical spine showed a small central disc herniation at the C3-4 level and minimal disc bulging at the C4-5 and C5-6 levels of the spine. (R. at 224.)

On September 2, 1998, Stanley saw Dr. Gregory Corradino, M.D., a neurosurgeon, for an evaluation at Dr. Norton's referral. (R. at 316-17.) A physical examination revealed grossly intact cranial nerves. (R. at 317.) Dr. Corradino noted that Stanley was alert and fully oriented. (R. at 317.) Her strength in the upper

-14-

extremities rated as 4/5, but was normal in the lower extremities. (R. at 317.) A sensory examination was normal, and Stanley's reflexes were 1+, but symmetric with downgoing plantar responses. (R. at 317.) Cerebellar activities were performed with no slowing, and Stanley was able to walk in a satisfactory manner. (R. at 317.) Dr. Corradino noted a limited range of motion of the cervical spine secondary to pain in lateral rotation, flexion and extension. (R. at 317.) There was no evidence of spasm and no tenderness to palpation of the cervical musculature. (R. at 317.) No spinal deformity or atrophy of the muscles in the upper extremities was noted. (R. at 317.) Dr. Corradino diagnosed Stanley with neck and bilateral upper extremity pain. (R. at 317.)

Stanley saw Dr. Gayle Roulier, M.D., at Cancer Outreach Services for a mammogram on April 27, 1999. (R. at 405.) Calcifications were seen in the right breast, but Dr. Roulier noted that additional imaging was needed. (R. at 405.) She recommended an ultrasound of the right breast. (R. at 405.)

Stanley was seen by Dr. Todd Cassel, M.D., at Clinch River Health Services from April 23, 2002, through November 14, 2002. (R. at 406-16.) During this time, Stanley complained of an irregular heartbeat, fatigue, right arm and elbow pain, nausea and weakness, depression, poor sleep, neck pain radiating into the arm with numbness and weakness of the hand, restless legs at night and anxiety. (R. at 407-12.) Stanley was diagnosed with trigeminy,[8] fatigue, fibromyalgia, hypothyroidism, bursitis of the

_____

[8]Trigeminy refers to the condition occurring in threes, especially the occurrence of three pulse beats in rapid succession. *See* Dorland's at 1756.

-15-

right arm, major depression, disabling lateral epicondylitis,[9] possible cervical disc disease, possible cervical tendonitis and possible seizure activity.  (R. at 407-09, 411-12.)

In May 2002, Stanley requested that Dr. Cassel give her an excuse to reduce her work hours until she could regain her energy.  (R. at 412.)  In June 2002, Stanley's right arm was slightly edematous compared to the left.  (R. at 411.)  She received a Depo Medrol and Marcaine injection.  (R. at 411.)  On June 26, 2002, Stanley had a full range of motion of the right elbow with diffuse tenderness.  (R. at 410.)  However, an x-ray of the right elbow was within normal limits.  (R. at 416.)  On July 17, 2002, Stanley exhibited mild decreased strength in hand grip and some possible bicep/tricep strength on the right compared to the left.  (R. at 409.)  Her reflexes were symmetrical, but she exhibited some possible decreased sensation of the palm.  (R. at 409.)  Stanley was very tender over the epicondyle area.  (R. at 409.)  She received another Depo Medrol injection.  (R. at 409.)  On August 14, 2002, Dr. Cassel reported that Stanley was "really down," noting that she spent most of the month in bed.  (R. at 409.)  He further noted tenderness of the right elbow with possible atrophy of the right hand.  (R. at 409.)  Stanley's dosage of Effexor was increased.  (R. at 409.)  By September 18, 2002, Stanley stated that she felt like she was going to have a breakdown.  (R. at 408.)  She stated that her elbow was "killing her."  (R. at 408.)  A physical examination revealed tenderness at the base of the neck. (R. at 408.)  However, Stanley had good strength of the left arm with tenderness and swelling of the elbow and discomfort across the shoulder.  (R. at 408.)  X-rays of the cervical spine revealed only mild

---

[9]Epicondylitis refers to an inflammation of the epicondyle or of the tissues adjoining the epicondyle of the humerus.  *See* Dorland's at 565.

-16-

degenerative findings. (R. at 415.) By October 2002, Dr. Cassel noted that Stanley's mood was "a little better." (R. at 408.) She exhibited some tenderness and swelling along the neck, shoulder and elbow without deformity. (R. at 408.) Stanley received another Depo Medrol injection, was prescribed Trazadone and her dosage of Effexor was again increased. (R. at 408.)

Stanley saw Donna Abbott, M.A., a licensed psychological examiner, and B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, on October 10, 2002, for a psychological evaluation. (R. at 395-400.) Although Stanley noted that she was not then involved in any psychiatric treatment, she reported that she had bipolar disorder. (R. at 396.) Stanley reported working for two years doing private care sitting, eventually leaving in June 2002 due to pain and depression. (R. at 397.) Abbott noted that Stanley was fully oriented and able to attend, concentrate, follow directions and complete tasks without difficulty. (R. at 397.) Her affect was appropriate, but she seemed somewhat intent on presenting herself in a negative light. (R. at 397.) Although Stanley reported having had hallucinations, Abbott noted no overt signs of disordered thought processes or delusional thinking. (R. at 397-98.)

Stanley reported that she was diagnosed as bipolar by a psychiatrist in 1997. (R. at 398.) She described herself as "very, very, very depressed." (R. at 398.) Stanley reported that she did nothing during the day. (R. at 398.) Abbott opined that Stanley was able to manage her own resources. (R. at 398.) She administered the Minnesota Multiphasic Personality Inventory-Third Edition, ("MMPI-III"), but Stanley's profile was significantly invalid. (R. at 398.) All scales were significantly elevated, suggesting a person attempting to present herself in a negative light. (R. at

-17-

398.)   The Miller Forensic Assessment of Symptoms Test, ("MFAST"), also was administered, and Stanley achieved a total score of 17, a score well above the cutoff score of 6 indicative for malingering.  (R. at 399.)  Abbott further noted that it took Stanley almost 11 minutes to complete the test, further indicative of malingering.  (R. at 399.)  Abbott noted that although Stanley reported an inability to sit still in a chair, this was not observed.  (R. at 399.)  She further noted that although Stanley reported having to check under her chair many times to see if things were under it, this also was not observed.  (R. at 399.)  Stanley stated that she heard a loud radio playing when no radio was near her and that she saw people that were not really there.  (R. at 399.)  Stanley reported smelling strange odors when she could not sleep and opined that she had more than one personality.  (R. at 399.)

Stanley was diagnosed with malingering, personality disorder, not otherwise specified, with histrionic features and a then-current Global Assessment of Functioning, ("GAF"), score of 65.[10]  (R. at 399-400.)  Abbott concluded that Stanley obviously attempted to present herself in a negative light.  (R. at 400.)  Although she reported a diagnosis of bipolar disorder, Abbott noted that there were no criteria to suggest such a disorder.  (R. at 400.)  It was further noted that Stanley was not involved in any psychiatric treatment and had never undergone significant treatment.  (R. at 400.)  Her affect was fairly appropriate and significant depression was not

_____

[10]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, occupational, and school functioning on a hypothetical continuum of mental health-illness."  DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).  A GAF of 61 to 70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ..., but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV at 32.

-18-

indicated.  (R. at 400.)  These findings were affirmed by psychologist Lanthorn.  (R. at 400.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating SSI claims.  *See* 20 C.F.R. § 416.920 (2004); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work.  *See* 20 C.F.R. § 416.920 (2004).  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step.  *See* 20 C.F.R. § 416.920(a) (2004).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

-19-

By decision dated February 11, 2003, the ALJ denied Stanley's claim. (R. at 358-64.) The ALJ found that Stanley had not engaged in substantial gainful activity since March 19, 1997. (R. at 364.) The ALJ also found that the medical evidence established that Stanley had a severe impairment, namely severe musculoskeletal impairments, but he found that Stanley did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 364.) The ALJ found that Stanley had the residual functional capacity to perform light work, diminished by an inability to engage in repetitive work above shoulder level. (R. at 364.) Thus, the ALJ concluded that Stanley could perform her past relevant work as a sewing machine operator. (R. at 364.) Therefore, the ALJ concluded that Stanley was not under a disability as defined by the Act and was not eligible for SSI benefits. (R. at 364.) *See* 20 C.F.R. § 416.920(f) (2004).

In her brief, Stanley argues that the ALJ erred by giving greater weight to the opinion of the medical expert, Dr. Griffin, as opposed to his treating source, Dr. Cassel. (Motion For Summary Judgment And Memorandum Of Law On Behalf Of The Plaintiff, ("Plaintiff's Brief"), at 5-7.) Stanley further argues that the ALJ erred by relying on the absence of objective evidence of fibromyalgia in denying benefits. (Plaintiff's Brief at 7-11.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by

substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Stanley argues that the ALJ erred by crediting the expert testimony of Dr. Griffin over the assessments of her treating physician, Dr. Cassel. (Plaintiff's Brief at 5-7.) I first note that the ALJ did not reject the majority of Dr. Cassel's findings.[11] Instead, it appears that in discussing Dr. Cassel's office notes, the ALJ found that Stanley's subjective allegations over this time were, in fact, *not* substantiated by Dr. Cassel's findings. I first will address Stanley's physical impairments.

---

[11]It appears that the only finding of Dr. Cassel that was rejected by the ALJ was that Stanley suffered from *disabling* lateral epicondylitis. (R. at 409.) Nonetheless, Dr. Cassel placed no restrictions on Stanley as a result of this finding. I further note that findings of disability are reserved solely to the Commissioner. *See* 20 C.F.R. § 416.927(e) (2004).

Stanley saw Dr. Cassel from April 2002 through November 2002.  (R. at 406-16.)  During this period, despite complaints of an irregular heartbeat, decreased energy and right arm and elbow pain, the record reveals that diagnostic testing consistently revealed minimal findings.  Stanley was treated conservatively, and Dr. Cassel imposed no restrictions.  (R. at 406-16.)  Although Dr. Cassel diagnosed Stanley with disabling lateral epicondylitis in June 2002, (R. at 409), it is well-settled that determinations of disability are reserved solely to the Commissioner.  *See* 20 C.F.R. § 416.927(e) (2004).

Not only do Dr. Cassel's findings fail to support Stanley's subjective allegations, they are not supported by the record as a whole, including the physical findings of Dr. Griffin.  Dr. Griffin found that cervical disc disease was the only diagnosis adequately documented in the record.  (R. at 431.)  He concluded that Stanley did not meet or equal a listed impairment and found that she was limited to lifting and carrying items weighing up to 30 pounds occasionally and up to 15 pounds frequently.  (R. at 432.)  Dr. Griffin further concluded that Stanley should not engage in repetitive work above shoulder level.  (R. at 432.)  Moreover, Dr. Norton's office notes reveal only mild narrowing at the C4-5 level of the cervical spine without acute focal disc herniation.  (R. at 280.)  Although these notes further reveal that Stanley exhibited a positive Tinel's sign and positive actual compression at the C5-6 level of the spine, he opined that Stanley could work occasionally.  (R. at 208, 211.)  In November 1997, Stanley exhibited a full range of motion of all joints and no tenderness, heat, swelling or deformity of any joint.  (R. at 291.)  She also exhibited a full range of motion of the neck and back and straight leg raising was negative.  (R. at 291-92.)  She exhibited a full grip into the palm and could tandem walk.  (R. at 292.)

-22-

Stanley further exhibited 5/5 strength in the upper extremities and had intact sensation throughout. (R. at 292.) Dr. Konrad noted no sensory radiculopathy or peripheral neuropathy. (R. at 292.) He concluded that Stanley's physical examination was unremarkable and that she had no impairment-related physical limitations. (R. at 293.) Likewise, on December 9, 1997, state agency physician Dr. Hays concluded that Stanley had no impairment-related physical limitations. (R. at 314.) In July 1998, Stanley exhibited only tenderness to palpation of the cervical spine and a limited range of motion on right lateral lean, rotation, flexion and extension of the head. (R. at 192.) Her grips were equal and deep tendon reflexes were within normal limits and without paresthesia. (R. at 192.) X-rays of the cervical spine revealed no gross abnormalities, but an MRI revealed a small central disc herniation at the C3-4 level of the spine and minimal disc bulging at the C4-5 and C5-6 levels of the spine. (R. at 224-25.)

In September 1998, a physical examination revealed grossly intact cranial nerves, 4/5 strength in the upper extremities and normal lower extremity strength. (R. at 317.) A sensory examination was normal. (R. at 317.) Stanley exhibited a limited range of motion of the cervical spine secondary to pain in lateral movement. (R. at 317.) However, there was no evidence of spasm and no tenderness to palpation of the cervical musculature, and no spinal deformity or atrophy of the muscles in the upper extremities was noted. (R. at 317.) Despite complaints of right elbow pain in June 2002, Stanley exhibited a full range of motion and an x-ray was within normal limits. (R. at 410, 416.) The following month, Stanley exhibited only mildly decreased grip strength and some possible decreased bicep/tricep strength on the right compared to the left. (R. at 409.) Some decreased sensation of the palm was noted. (R. at 409.) In September 2002, Stanley exhibited tenderness at the base of the neck, but she had

-23-

good left arm strength with swelling and tenderness at the elbow and discomfort across the shoulder. (R. at 408.) X-rays showed only mild degenerative findings. (R. at 415.) Finally, in October 2002, Stanley exhibited some tenderness and swelling along the neck, shoulder and elbow without deformity. (R. at 408.)

For these reasons, I conclude, first, that the ALJ did not reject Dr. Cassel's opinion, second, that Dr. Cassel's findings are consistent with the record as a whole, including Dr. Griffin's testimony and, third, that the medical evidence of record supports the ALJ's finding that Stanley does not suffer from a disabling physical impairment.

Stanley also argues that the ALJ erred by relying on the lack of objective medical evidence in finding that her fibromyalgia was not disabling. (Plaintiff's Brief at 7-11.) It is true that there are no laboratory tests for the presence or severity of fibromyalgia. *See Stup v. UNUM Life Ins. Co of Am.*, 390 F.3d 301, 303 (4th Cir. 2004) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)). The Seventh Circuit noted that "[s]ome people may have such a severe case of fibromyalgia as to be totally disabled from working, ... but most do not." *Sarchet*, 78 F.3d at 307. Nonetheless, even assuming that Stanley indeed suffers from fibromyalgia, she still must show an inability to perform substantial gainful activity in order to be eligible for benefits. For the following reasons, I find that Stanley has not made such a showing.

None of Stanley's treating physicians imposed any physical restrictions on her despite her fibromyalgia. Moreover, as noted above, physical examinations consistently revealed minimal findings. Furthermore, on December 9, 1997, state

-24-

agency physician Hays concluded that Stanley had no impairment-related physical limitations. (R. at 314.) On June 24, 1998, Dr. Mirza concluded that Stanley was unable to work or was severely limited in her ability to work for a period of 30 days. (R. at 313.) However, Dr. Mirza further noted that the extent of Stanley's limitation would be dependent on her symptom control. (R. at 313.) The record clearly reveals that Stanley has a history of noncompliance with her medications. (R. at 193, 198, 211.) Thus, symptom control is likely more an issue of noncompliance with medication rather than an inability of medication to effectively treat her symptoms.

Although Stanley testified to disabling pain and symptoms, the ALJ properly deemed such allegations incredible. As previously discussed, the medical evidence of record simply does not support Stanley's subjective complaints. Moreover, Stanley has been characterized as malingering on more than one occasion. For instance, in November 1997, psychologist Hughson noted that testing revealed malingering. (R. at 297.) Later, in October 2002, psychological examiner Abbott noted that the MMPI-III indicated an individual attempting to present herself in a negative light. (R. at 398.) Likewise, Stanley achieved a score on the MFAST nearly three times that which indicates malingering. (R. at 399.) Aside from objective evidence of malingering, there are several things in the record that call Stanley's credibility into doubt. In November 1997, psychologist Hughson noted that Stanley had difficulty being cooperative throughout the interview. (R. at 295.) During Abbott's interview, although Stanley reported an inability to sit still in a chair, such behavior was not observed. (R. at 399.) Stanley also reported the need to constantly look under her chair to see if anything was there. (R. at 399.) However, this behavior also was not observed. (R. at 399.)

-25-

For all of these reasons, I find that substantial evidence supports the ALJ's finding that Stanley is not disabled based on fibromyalgia or pain. I further find that the above evidence supports the ALJ's finding that Stanley did not suffer from a severe mental impairment.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence supports the ALJ's weighing of the medical evidence with regard to Stanley's physical impairments;

2.    Substantial evidence supports the ALJ's weighing of the medical evidence with regard to Stanley's alleged mental impairments; and

3.    Substantial evidence supports the ALJ's finding that Stanley was not disabled under the Act and was not entitled to benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Stanley's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A.

-26-

§ 636(b)(1)(c):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge]. The judge may also receive further evidence or recommit the matter to the magistrate [judge] with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen M. Williams, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:        This 30th day of March 2005.

/s/  Pamela Meade Sargent

UNITED STATES MAGISTRATE JUDGE

-27-

-28-